Application of SOUTH HAVEN
SEWER WORKS, INC.

City of Portage, Appellant–Intervenor,

v.

South Haven Sewer Works, Inc.,
Appellee–Petitioner.

No. 93A02–0703–EX–204.

Court of Appeals of Indiana.

Feb. 11, 2008.

Bette J. Dodd, Joseph P. Rompala, Lewis & Kappes, P.C., Indianapolis, IN, Clyde Douglas Compton, Hodges & Davis, P.C., Merrillville, IN, Attorneys for Appellant.

Phillip J. Fowler, David T. McGimpsey, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Intervenor, City of Portage (the City), appeals the Indiana Utility Reg-

ulatory Commission's grant of a Certificate of Territorial Authority to Appellee–Petitioner, South Haven Sewer Works, Inc. (South Haven), to render a sewage disposal service in additional rural areas of Porter County, Indiana.

We reverse.

## ISSUE

The City raises two issues on appeal, one of which we find dispositive and which we restate as: Whether the Indiana Utility Regulatory Commission (the Commission) erred as a matter of law when it determined that South Haven had lawful authority to expand its geographic service territory despite a federal consent decree that appears to prohibit South Haven's expansion without the Environmental Protection Agency's (EPA) approval.

## FACTS AND PROCEDURAL HISTORY

South Haven is an Indiana corporation with its principal office located in Valparaiso, Indiana. The corporation owns and operates a wastewater collection and treatment system in Porter County. On March 24, 2006, South Haven filed a Verified Petition with the Commission, seeking an expansion of its Certificate of Territorial Authority (CTA) to include a territory that ran west, from Bay Road, which is the boundary of its existing CTA, a mile-and-a-half to Willowcreek Road, and in the north from County Road 700 North, south to State Road 130.

On April 28, 2006, the Commission granted the City the right to intervene in the proceedings. The City objected to the issuance of a CTA to South Haven for this specific area, in part, because the City's sewer services already extended to the south side of County Road 700 North and as far west as Willowcreek Road. Essentially, the proposed CTA included all of the land south of the City's existing bound-

aries. During the course of the proceedings, South Haven agreed to reduce its request to exclude the northwest half of the originally requested area, confining the CTA to a territory a half mile south of County Road 700 North, and within a mile of Willowcreek Road. Despite the reduction, the CTA includes both the east and west side of Airport Road, an area in which the City anticipates growth and subsequent annexation.

On September 19, 2006, the Commission held a public hearing on South Haven's petition. On January 31, 2007, the Commission issued a final Order concluding that South Haven had met all statutory and regulatory requirements, thereby granting the corporation a CTA for the modified territory.

The City now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Standard of Review

This court's standard of review on an appeal from a final decision, ruling, or order of the Commission is well settled. Our review is limited to whether the agency based its decision on substantial evidence, whether the agency's decision was arbitrary and capricious, and whether it was contrary to any constitutional, statutory, or legal principle. *Nextel West Corp. v. Indiana Util. Regulatory Comm'n,* 831 N.E.2d 134, 144 (Ind.Ct.App.2005), *reh'g denied, trans. denied.* We are not allowed to conduct a trial *de novo,* but rather, we defer to an agency's fact-finding, so long as its findings are supported by substantial evidence. *Id.*

Pursuant to Indiana Code section 8–1–3–1, our review of an order of the Commission is two-tiered: we determine whether the Commission's decision con-

tains specific findings on all of the factual determinations material to its ultimate conclusions, and we determine whether there is substantial evidence in the record to support the agency's basic findings of fact. *Id.* Basic findings of fact are important because they enlighten the reviewing court as to the agency's reasoning process and subtle policy judgments and allow for a rational and informed basis for review, which lessens the likelihood that a reviewing court would substitute its judgment on complex evidentiary issues and policy determination better decided by an agency with technical expertise. *Id.* Requiring an agency to set forth the basic findings also assists the agency in avoiding arbitrary or ill-considered action. *Id.* To determine whether there was substantial evidence sufficient to support the agency's determination, we must consider all evidence, including evidence in opposition to the determination. *See id.* A reviewing court may set aside agency findings of fact only when the court determines, after a review of the entire record, that the agency's decision clearly lacks a reasonably sound basis of evidentiary support. *Id.* at 144–45.

▪ In addition, this court determines whether the Commission's order is contrary to law, that is, whether the order is the result of considering or failing to consider some factor or element that improperly influenced the final decision. *Id.* at 145. We have previously explained that a decision is contrary to law when the Commission fails to stay within its jurisdiction and abide by the statutory and legal principles that guide it. *Id.*

## II. *Expansion of Geographic Service Territory*

▪ The City contends that the Commission erred as a matter of law by concluding that South Haven has the lawful power and authority to render sewage services in the requested CTA pursuant to Ind.Code § 8–1–2–89(e)(1).[1] Specifically, the City argues that the unambiguous language of a consent decree executed between the EPA and South Haven mandates South Haven to seek EPA's approval prior to expanding its service territory. As South Haven failed to provide the required documentation, the City maintains that South Haven could not lawfully provide sewer services.

The record reflects that on November 18, 2003, South Haven and the EPA entered into a consent decree settling a lawsuit filed by the EPA in the United States District Court for the Northern District of Indiana. In its Complaint, the EPA sought injunctive relief and civil penalties as a result of South Haven's violations of the Clean Water Act, the National Pollutant Discharge Elimination System (NPDES), and EPA's Administrative Order V–W–98–OA–19.

▪ While a consent judgment or decree enjoys all of the force and effect of

---

1. I.C. § 8–1–2–89(e)(1) reads as follows:

   If, after notice of hearing and hearing on any application for a certificate of territorial authority, the commission shall find from the evidence introduced at such hearing, including any evidence which the commission shall have caused to be introduced as a result of any investigation which it may have made into the matter, that the applicant had proved:

   (1) lawful power and authority to apply for said certificate and to operate said proposed service; ...
   then the certificate of territorial authority, defining and limiting the rural area to be covered thereby, shall be granted to the applicant, subject to such terms, restrictions, limitations and conditions, including but not limited to a reasonable time in which to commence operations, as the commission shall determine to be necessary and desirable in the public interest.

a judgment of the court, it is characterized by our courts as a contract to which the rules of contract construction apply. *Gary Mun. Airport Auth. Dist. v. Peters,* 550 N.E.2d 828, 835 (Ind.Ct.App.1990). When asked to construe a consent judgment, the court must determine and effectuate the intent of the parties thereto. *Id.* If the language of the agreement is unambiguous and the intent of the parties is discernable from the written contract, the court must give effect to the terms of the contract. *Stenger v. LLC Corp.,* 819 N.E.2d 480, 484 (Ind.Ct.App.2004), *trans. denied.* A contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation. *Id.* The terms of a contract are not ambiguous merely because the parties disagree as to their interpretation. *Id.* Where the terms of a contract are clear and unambiguous, the terms are conclusive and we will not construe the contract or look at extrinsic evidence, but will merely apply the contractual provisions. *Id.*

In Section V(8)(a) of the consent decree, the parties stipulated, in pertinent part, that

> Commencing on the Effective Date and continuing until termination, South Haven shall not expand its *sewer connections or service area* unless, for *each proposed expansion, it demonstrates to EPA that:* (1) the facility has the capacity to receive and treat the projected additional wastes in compliance with its NPDES Permit and the Act; and (2) exfiltration or infiltration in each sewer line transporting sewage from any new service area will not exceed 200 gallons per inch of pipe diameter per mile per day for any section of the system.

(Appellant's App. p. 150) (emphasis added). The term service area is clarified in the definitional section IV of the decree, in

pertinent part, as "all areas in which South Haven is authorized to collect and convey sewage." (Appellant's App. p. 149).

Faced with these provisions, the Commission found the language to be ambiguous and ventured beyond the four corners of the decree to determine the parties' intent. With regard to the terms of the decree, the Commission interpreted and found as follows:

> (1) *Legal Authority.* South Haven presented evidence that it has the lawful power and authority to apply for the requested CTA and to render sewage disposal service in the Reduced CTA Areas. [The City] challenged South Haven's legal authority based on the [c]onsent [d]ecree, arguing that the [c]onsent [d]ecree requires the [EPA] to approve new service areas. [The City's] proffered evidence to support this position is the [c]onsent [d]ecree itself and Mr. Saylor's[2] testimony that the [c]onsent [d]ecree is still in effect. South Haven, however, provided the testimony of Mr. Saylor to show that the [EPA] views service area as new service connections. Mr. Saylor provided the new connection authorization letters from the [EPA] that support Mr. Saylor's position. [ ] The [EPA] letters refer to service area expansions for South Haven in territory for which this Commission has already granted South Haven a CTA. Thus, it is clear that the [EPA] views service area as service connections and focuses on physical connections to South Haven's system.
>
> The goal of the [c]onsent [d]ecree is to improve South Haven's system such that violations are reduced and eliminated, and the [EPA's] oversight and approval of physical connections to South Haven's system furthers this goal. [The City's]

---

**2.** Mr. Saylor is the majority shareholder and CEO of South Haven.

asserted interpretation would have the [EPA] regulating matters that do not involve a physical connection to South Haven's system and thus, that do not further the goal of the [c]onsent [d]ecree. Moreover, [the City's] construction of the [c]onsent [d]ecree would overlap this Commission's jurisdiction, making the approval of service territory duplicative and with the [EPA] straying into an area reserved to State law. Accordingly, we find that the [c]onsent [d]ecree does not impinge South Haven's legal authority over service territory. The [EPA's] letters authorizing new connections are evidence supporting this issue, as they are the only direct evidence from the [EPA] as to how that agency interprets the [c]onsent [d]ecree.

Based on the record evidence, we find that South Haven has the requisite lawful power and authority to apply for the requested CTA and to render sewage disposal service in the Reduced CTA Areas.

(Appellant's App. pp. 12–13).

Unlike the Commission, we find the consent decree's language to be unambiguous when combining both relevant provisions. By defining service area as the area South Haven was providing sewer service to at the time of executing the consent decree, any future *"proposed expansion"* of the service area requires EPA's approval pursuant to Section V(8)(a). (Appellant's App. p. 150) (emphasis added). Accordingly, as South Haven proposed to expand its original CTA by filing a petition with the Commission, it should have requested EPA's prior approval.

Our interpretation is supported by other provisions of the decree. First, section III states, in pertinent part, that

It is the express purpose of the parties in entering into this [c]onsent [d]ecree to further the objectives of the Clean Water Act, ... All plans, reports, construction, remedial maintenance, monitoring programs, and other obligations in this [c]onsent [d]ecree or resulting from the activities required by this [c]onsent [d]ecree shall have the objectives of ensuring South Haven's full compliance with the Clean Water Act ...

(Appellant's App p. 147). Furthermore, among the Compliance Measures imposed upon South Haven in section V of the consent decree to achieve this express purpose is an obligation to eliminate bypasses and overflow from the facility, including the obligation to conduct a capacity assessment and develop and implement a corresponding capacity assurance plan intended to reduce infiltration, spill, release, or diversion of wastewater from a sanitary system. Thus, in other words, one of the principal goals of the consent decree is to monitor South Haven's sewage amounts to ensure it does not accept more sewage than its facility can accommodate. Even though South Haven argues that the proposed expansion here amounts to a mere change in the legal boundaries of its service territory because no customers reside in the area yet, we find the argument without merit. While a proposed expansion would concededly alter South Haven's service boundaries, it also necessarily indicates that the company is anticipating to offer services in the new area in the near future. As a result, a change in its service capacity is expected, and thus, the expansion would still be subject to the prior approval as envisioned under section V(8)(a) of the consent decree.

We are equally unpersuaded by South Haven's suggestion that "sewer connections or service area," as used in section V(8)(a) connote the same thing. Mindful to avoid construction of contractual language that would render any words, phrases, or terms ineffective or meaningless, we

necessarily conclude that both terms mean different things. *See City of Lawrenceburg v. Milestone Contractors, L.P.*, 809 N.E.2d 879, 883 (Ind.Ct.App.2004), *trans. denied*. While sewer connection clearly refers to the physical connection of a building, be it residential or business, to an existing sewage network, service area, as defined, indicates a geographical territory of operation.

Therefore, because the consent decree's language is unambiguous, its terms are conclusive and we will not construe the contract or look at extrinsic evidence, but will merely apply the contractual provisions. *See Stenger*, 819 N.E.2d at 484. As a result, the Commission erred when it used Mr. Saylor's testimony and other documents to effectuate the intent of the parties.

■ Nevertheless, South Haven, and the Commission in its Order, now assert that our interpretation of the consent decree invades State jurisdiction, in violation of the Tenth Amendment to the United States Constitution. Specifically, they argue that while the EPA is vested with authority to regulate activities that impact the environment, including the actual operations of sewer utilities, the EPA does not have the power to determine the legal geographic boundaries of an Indiana utility. By requiring EPA approval of every expansion proposal South Haven intends to formulate, the Commission maintains that this interpretation essentially inundates the EPA with power over State matters. We disagree.

Here, in exchange for the termination of the federal litigation commenced by EPA, South Haven voluntarily accepted the consent decree's condition to subject any future expansion plans to EPA's approval. While this requirement undoubtedly affects South Haven's possibilities in expanding its business, it by no means interferes

with Indiana's regulatory prerogative. The fact that South Haven cannot request an expansion of its service territory from the Commission without EPA's approval is a result of the obligations South Haven voluntarily assumed to protect its ability under federal law to continue providing wastewater treatment services; it is not an usurpation of the Commission's authority to regulate South Haven under Indiana law. Even after having acquired EPA's approval, the Commission still holds the ultimate decision whether to grant South Haven's request for expansion. Thus, we fail to detect a federal infringement upon state regulatory authority.

In sum, the unambiguous terms of the consent decree indicate an intent to prevent South Haven's expansion beyond that which its facility could handle. An important component in effectuating that intent was the requirement to get EPA's permission before increasing South Haven's service area. Consequently, when South Haven petitioned the Commission for an expanded CTA without having acquired EPA's approval, it did so without the lawful power and authority to provide services as required by I.C. § 8–1–2–89(e). Therefore, we hold that the Commission erred as a matter of law when it granted South Haven's proposed expansion.

### CONCLUSION

Based on the foregoing, we conclude that the Commission erred as a matter of law when it determined that South Haven had lawful authority to expand its geographic service territory.

Reversed.

KIRSCH, J., and MAY, J., concur.